**HOLDEN et ux. v. ROBERTSON & MUELLER. (No. 11758.)**

Court of Civil Appeals of Texas. Fort Worth. April 2, 1927.

**1. New trial ⊙⇒78(1)—Denying new trial for newly discovered evidence on third trial of action for death following automobile collision held not error.**

Denying new trial on ground of newly discovered evidence on third trial of action for death following collision between ambulance and automobile, where evidence as to liability was sharply conflicting, *held* not error.

**2. New trial ⊙⇒97—Absence of witness held not ground for new trial, where no motion for continuance was made.**

Overruling motion for new trial, sought on basis of testimony of absent witness, *held* not error, where no motion for continuance was made at trial.

Appeal from District Court, Tarrant County; H. S. Lattimore, Judge.

Suit by C. C. Holden and wife against Robertson & Mueller. Judgment for defendants, and plaintiffs appeal. Affirmed.

Houtchens & Clark, of Fort Worth, for appellants.

Burgess, Burgess, Chrestman & Brundidge, of Dallas, Charles T. Rowland, of Fort Worth, and L. E. Elliott, of Dallas, for appellees.

BUCK, J. Plaintiffs below, C. C. Holden and wife, filed suit in the district court of Tarrant county against L. P. Robertson and F. P. Mueller, for damages for the death of their son, Clyde Holden. Plaintiffs alleged that their son received injuries of a minor nature from falling off the running board of a Dodge coupé on East Belknap street in the city of Fort Worth, on the 3d day of November, 1924; that the ambulance of the defendants was called to take him to the hospital; that, while the defendants were engaged in carrying Clyde Holden to the hospital in their ambulance, they negligently and carelessly caused the ambulance to be overturned at the intersection of Throckmorton and Seventh streets in the city of Fort Worth; and that from the overturning of said ambulance said Clyde Holden sustained injuries from which he died.

Defendant answered by demurrers, both special and general, a general denial, and spe-

cially pleaded, among other matters, that the said Clyde Holden received his fatal injuries from falling off the running board of the Dodge coupé, and that he was in a dying condition when he was placed in the ambulance. This was the principal contested issue in the trial court.

The cause was submitted to a jury on special issues, which, with their answers, are hereinafter set out: (1) That the driving of defendants' ambulance at whatever speed the jury believed it was being driven as it approached Throckmorton and Seventh streets on the occasion of the collision was negligence, and that such negligence was the proximate cause of the collision with a Ford car at the intersection of said streets. (2) That the driver of the ambulance was not using ordinary care to keep a lookout for crossing traffic at Seventh and Throckmorton streets, and that the failure to use such care was the proximate cause of the collision with the Ford car. (3) That the ambulance driver was not negligent in not taking Clyde Holden to the City-County Hospital, which was shown to be located at Fifth and Jones streets. (4) That the collision between the ambulance and the Ford car at Seventh and Throckmorton streets was not an unavoidable accident. (5) That Clyde Holden, independent of the happening at Seventh and Throckmorton streets, would not have recovered from the injuries sustained by him at 505 East Belknap street, sufficiently to have been of any pecuniary assistance to the plaintiffs. Upon this verdict the court entered judgment for the defendants, and the plaintiffs have appealed.

### Opinion.

As before stated, the principal question at issue was as to whether Clyde Holden was fatally injured by falling off the running board of the Dodge coupé in front of 505 East Belknap street, and whether he was in a dying condition when placed in the ambulance.

The evidence showed that Tommy Smith was on that day driving a Dodge coupé, and went by the Riverside drug store, in the eastern part of Fort Worth and across the Trinity river, where he met Clyde Holden. The two young men then went to the Holden home, where Lois Holden, Alva Brown, then Alva Maben, Ella Kurz, and Alice Ward were. The six young people got in the car, two of the young ladies sitting in the laps of the other two, and Clyde riding inside of the car at first or standing outside on the left running board; the evidence upon this point being contradictory. Young Smith testified that Clyde rode inside the car until they got up on Belknap street, and just as they crossed the railroad tracks he got out on the running board. At least one of the girls testified that he was riding on the running board from the time they left the Holden home. At the time he fell off the running board, he was holding onto the visor of the car, which came loose, and he fell on the paved street. Smith testified that Clyde fell to the pavement on his hands and knees, and he stopped the car and went back to where he was; that he was not driving fast when Clyde fell off, between 8 and 10 miles an hour; that he asked Clyde if he was hurt, and he replied that he could not tell yet; then he and another man picked Clyde up and placed him on the lawn at 505 East Belknap street; that he was there about five minutes before the ambulance came; that, while Clyde was on the lawn, the witness got some water and come back and held Clyde's head, and he seemed to move practically his whole body, and that he was mumbling something, but he could not understand what was said after Clyde was carried up on the lawn; that, when the ambulance came, being driven by George Mahan, Clyde was placed in the ambulance, and his sister, Lois Holden, and Ella Kurz got inside of the ambulance where Clyde was on a stretcher or cot.

Smith further testified that he followed the ambulance west on Belknap street and then south on Throckmorton until the collision and the overturning of the ambulance at Seventh and Throckmorton; that he stayed about a block behind the ambulance, or he was about a half block at the beginning, and that the ambulance gained on him a little; that the ambulance was going more than 45 miles an hour; that he was driving 45 miles an hour, and the ambulance gained on him; that the ambulance was going down the center of the street; that, as the intersection of Seventh and Throckmorton streets was reached the ambulance hit a Ford sedan, coming from the west, and then turned facing the west curb and then towards the east curb, and ran into some iron pipes, originally placed on the corner there for hitching posts, and turned over. The Ford contained several people, and the ambulance struck the rear wheel and fender thereof and knocked it over against the light post on the southeast corner of the intersection. When he got down to the intersection, the ambulance was lying up on the curb of the southeast side of Throckmorton street, and he saw the driver of the ambulance get out, and he could not tell whether he was hurt or not; that Clyde seemed to be lifeless; that there was a difference in him then and when he left Belknap street; that he did not seem to breathe as freely as he did on Belknap street; that he did not seem to have as much life in him as he did before; that when he was at 505 Belknap street he moved his arms and legs and practically his whole body. On cross-examination, he testified that he was not sure Clyde was in the car when they left the Holden home or not, but that he got out of the car at some time before the accident on Belknap street and was standing on the running board; that at the time of the accident on Belknap street he did not see blood all over Clyde's face, though he saw some blood; that he saw a lady take Clyde's head

in her lap while he was on the lawn and wipe off the blood from his face. This lady was a Mrs. Scott, whose testimony will be later given.

K. M. Howard, a police officer, testified that in the afternoon of November 30, 1924, he was at the corner of Sixth and Main streets, and that he ran up to Seventh and Throckmorton streets and saw the ambulance coming; that it was running about 50 miles an hour; that he saw the actual collision between the two cars; that a street car track runs east and west on Seventh street, and one north and south on Throckmorton street; that the Ford sedan had crossed over the street car track running north and south, and was coming east; at least the back wheels had crossed the east car line when it got hit.

Alva Brown, née Maben, testified that they left the Holden home about 2:30 in the afternoon and went first up to the Riverside drug store; that Clyde got out for some chewing gum; that at or near 505 East Belknap street Clyde, who was standing on the running board at the right-hand side of the car, fell off and hit on his feet and then fell on his knees and hands and head on the pavement; that they were driving slow at the time he fell off; that, when they got back to where Clyde had fallen, Tommy Smith asked him if he was hurt, but she did not hear Clyde say anything; that Tommy Smith and some man helped Clyde over onto the lawn of the house at 505 East Belknap street; that she did not see any evidence of injury about his face; his nose was bleeding, though she did not remember whether there was any indication of any bruise or injury to his nose; that, after the ambulance came, they put Clyde on a stretcher and Lois and Ella Kurz got in the ambulance with him, and she, Tommy, and Alice got into the car and followed the ambulance; that they drove fast; that the stretcher was fastened up against the left-hand side of the ambulance, and that Lois Holden and Ella Kurz sat on the right-hand side of the stretcher; that, at the time of the accident on Belknap street, Lois Holden cried out when Clyde was falling, and that she was scared, naturally, from that time until the ambulance left with him; that the witness was scared and uneasy about Clyde; that he was lying there on his back, breathing heavily, having great trouble getting his breath; that she could not say that he was turning a little dark in his face.

Lois Holden, being recalled, testified:

That, after they got into the ambulance, and as they were turning off of Belknap street onto Throckmorton street, "they almost threw Clyde off the stretcher, and Ella and I caught him, and Clyde put his arm around me to hold. He opened his left eye. He moved his lips and opened his eyes and put his hands around me— his arm around me. I noticed a scar or mark about his face. There was one little skinned place I believe right along here, kind of over his left eye or more in the center than it was on either side, just above his eyes. With reference to the condition of things inside after the ambulance turned over, the stretcher was turned over, and the seat I was sitting in was broken up and glass all in there. The ambulance turned over hard. * * * I saw him over here at Belknap after they laid him upon the lawn, but I wasn't up so close to him. There was a crowd there. I was pretty badly scared. He didn't look like he was in pretty serious distress. I was scared. He didn't look like it. It was my first offense. I was so young. He didn't look like he was hurt so bad. * * * I did not see this lady with his head in her lap. Tommy had his head. I seen the lady sitting there washing his head. She didn't have his head in her lap· Tommy did. I did not see them cut his tie; they didn't cut his tie. I did not see them open up his shirt. I was around there. I stayed around there. I was crying and scared."

Ella Kurz testified that she was 15 years old and was with Clyde Holden and a party of young people when he fell off a car on Belknap street; that she was sitting on the right side of the car and sitting in the seat, and Alva Maben was in her lap; that she did not see Clyde when he fell off the car; that he was riding on the right running board; that when he fell off they stopped the car and went back to him, but she did not hear anybody talk to him; that she and Lois went in the ambulance with Clyde, and was in the ambulance when it turned over; that she remembered while they were riding in the ambulance that Clyde fell off the stretcher, and that Lois put her arm around his head, and he reached up and put his arm around Lois; that she helped Lois put him back on the stretcher.

Tommy Smith, recalled, testified that, when Clyde fell off the running board, he noticed some bruises or scratches about his person, and his eye was swollen; that there was not any bruises about any other part of his body that he could see. His face and hair were not bloody when they took him up on the lawn.

Mrs. Allie Scott testified that she and a young lady friend were out walking the afternoon of the accident, and she saw the Dodge coupé coming along Belknap street and noticed a young man on the running board; that they seemed to be in a good humor and to be having a good time; that the car was going pretty fast; that she saw the young man fall or just as he fell, and saw him taken up on the lawn, and she walked up and pulled off her gloves and began to rub the young man's head; that she said, "Oh, he is hurt, call an ambulance;" and that some one said that an ambulance had been called; that the young man looked like he was in a dying condition; that blood was gurgling in his throat like he was strangling, and, as he would breathe, it would gush out of his mouth; that blood was standing in his eyes, and his eyeballs were set, and his throat seemed to be swollen, and that his collar seemed to be pressing against his throat; that she tried to pull his tie loose,

and asked a young man to cut the tie off, which he did; that she never heard the young man say anything; that he was unconscious during the entire time; that there was blood over his ears, and over his face and around his nose and mouth; that witness was a practical nurse, though not a registered one; that in her opinion and from her experience and from what she saw she believed he was in a dying condition at the time he was on the lawn. She further testified that she smelled whisky on the young man's breath.

M. A. Turner testified that his place of business was at 505 East Belknap street and that he heard some one scream, and as he looked out of the door he saw a young man hit the pavement as he fell off the running board of a Dodge coupé; that he went to the place where the young man had been taken on the lawn, and when he got to him the body was rigid and he was practically unconscious; that he never saw a muscle move.

Edwin B. Walker testified that he saw the Dodge coupé going along East Belknap street, and saw young Holden standing on the running board of the car and swinging his body, and the whole party were talking and laughing and seemed to be enjoying themselves; that according to his judgment the car was moving from 20 to 25 miles an hour at the time young Holden fell off it; that he immediately went to the scene of the accident, and to the lawn where young Holden was lying, and in his opinion he was in a dying condition at the time; he was bleeding at the mouth and at one ear; he had discolorations on his forehead, which he believed were caused by a ruptured blood vessel; that he was not conscious at any time the witness saw him.

Mrs. J. H. Rainey, née Alice Ward, testified to the ride from the Holden home on the occasion in question, and to the fact that Clyde Holden was riding on the running board, holding to the sun visor, and that he was swinging his body; that the visor broke, and he fell and hit on his head and side on the pavement; that she went to the body after the accident, before it was taken up on the lawn, and that she did not hear him say anything before or after he was taken up on the lawn; that she thought his condition was serious, and that he was in a dying condition; that he had been drinking that afternoon, and that she knew such to be the case, as she smelled whisky on his breath; that after the accident she saw the bottle of whisky in the pocket on the side of the car; and that she and Alva and Tommy Smith placed it under the seat while they were following the ambulance.

It will thus be seen that the testimony as to the condition of Clyde Holden at the time he was placed in the ambulance, as to whether he was only slightly hurt by reason of the fall, or was in a dying condition, was sharply conflicting. On the motion for new trial, the plaintiff filed an affidavit from T. W. Terry, and in this affidavit Terry stated that he was present at the time of the accident on Belknap street and observed young Holden very closely from the time of the accident until he was put in the ambulance, and that the injured boy was bleeding at the nose, but was not bleeding from the mouth and ears, and that there was no blood in his eyes; that young Holden was lying in the yard for some six or eight minutes, and that he saw him move his legs, arms, and entire body, and saw him look about, and heard him make several remarks, and at one time the boy raised himself on his elbow, and that the lady who was with him told him to lie back down and that an ambulance would soon be there as it had been sent for, and that the boy said he wanted to go home; that there was no injured place on the boy except on his forehead, and a little rubbed place on the end of his nose; that he talked to the lady, evidently Mrs. Scott, who also testified, as heretofore shown, and that she told him she did not think the boy was seriously hurt; that he was just "shock-frightened"; that she thought he would be all right in a short time; that he heard the lady make these remarks to some other person after the injured boy was moved; that in his opinion Clyde Holden was not seriously hurt before he was placed in the ambulance.

In connection with this affidavit, was the affidavit of S. F. Houtchens, attorney for plaintiffs, who testified that he had gone down on Belknap street and had inquired of the neighbors as to who saw and was present at the time of the accident, and that he had never head of Terry until he was so informed by plaintiff C. C. Holden that a man named Terry was present; that he found out where Terry was working and talked to him and secured his affidavit.

Plaintiff C. C. Holden testified that he had used the utmost diligence to find all those who had seen the accident on Belknap street, and that he first learned of Terry's having been present a day or two prior to the time that affiant conversed with Terry, and immediately upon hearing of such witness searched the city of Fort Worth until he found him.

During the hearing on the motion for new trial, Terry testified substantially as he did in his affidavit, and that he was a laborer working at Sixth and Lamar streets, and that Mr. Holden came to his place of work and asked for him on March 1st; that he had been in Fort Worth since October, 1919, and had come from Jackson, Miss.; that he was employed for four years by an oil well supply company.

Tommy Smith testified that he saw Terry for the first time at the filling station east of the Rock Island tracks, shortly before the accident; that at the time of the accident he saw Terry there, but did not know his name; that subsequent to the accident he had worked at this filling station, and Terry stopped there, and he waited on him, and that he asked the young man who was running the

filling station, Famous Wildmon, what his name was, and that Famous told him it was Terry; that he subsequently told Mr. Holden. During the hearing, the court sent for Famous Wildmon, and he stated that he knew Tommy Smith, and that he did not have a conversation with Smith about who Terry was that he knew of; that Smith never had a conversation with him about Terry that he could remember; that he never had a conversation with Smith about his having seen the accident.

[1] We have not tried to quote all the evidence pro and con, either on the trial or on the motion for new trial, but we think we have substantially set out sufficient facts to show the importance of this evidence, and the sharp conflict in the testimony as to the nature of the injuries of the young man at the time of the accident on Belknap street. The evidence shows that this was the third trial of the cause. We are not advised as to the result of the first two trials, whether they resulted in a hung jury or in a judgment for plaintiff or defendant, and a new trial was granted. The trial court, who heard the motion and heard the testimony and knew the facts connected with the previous trials, was better able to judge than we are as to whether a new trial should have been granted, by reason of the newly discovered evidence or not. It is probable that in a case of an accident, like this, on the public streets, which a large number of persons saw and gathered about the injured person after the accident, the losing party could find other persons who had witnessed the accident, or knew something pertaining thereto, no matter how many trials had been had and how many motions for new trials had been granted for newly discovered evidence. There must be an end to litigation, and we are not prepared to say that the trial court erred in overruling the motion for new trial.

In 20 R. C. L. p. 289, § 72, the following is said:

"While newly discovered evidence, material to the party applying, which he could not with reasonable diligence have discovered and produced at the trial, is ground for a new trial, applications on this ground are not favored by the courts, and, in order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice as a last resort to escape the consequences of an adverse verdict, such applications should always be subjected to the closest scrutiny by the court, and the burden is upon the applicant to rebut the presumption that the verdict is correct, and that there has been a lack of due diligence. The matter is largely discretionary with the trial court, and the exercise of its discretion will not be disturbed except in a case of manifest abuse. This is also true in criminal cases, where new trials may be granted on this ground, which is not the case in some jurisdictions. In any event a motion for a new trial in a criminal case on the ground of newly discovered evidence must be made in the trial court and cannot be made in the appellate court. It seems that in some jurisdictions a new trial will not be granted on the ground of newly discovered oral testimony. In order to warrant the granting of a new trial on the ground of newly discovered evidence, it must appear (1) that the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; (5) that it is not merely cumulative or impeaching. Therefore it becomes necessary for the court to take into consideration the weight and importance of the new evidence, its bearing in connection with the evidence on the former trial, and even the credibility of the witnesses."

See, also, 20 Cyc. pp. 881, 882; Mitchell v. Bass, 26 Tex. 372; Ry. Co. v. Sciacca, 80 Tex. 350, 16 S. W. 31.

Therefore, especially in view of the fact that this was the third trial of the case, we overrule plaintiff in error's assignment directed to the action of the trial court in overruling a motion for a new trial, by reason of the alleged newly discovered evidence of Terry.

[2] Plaintiffs in error also urge that the trial court erred in not granting a new trial by reason of the fact that Dr. Day's testimony was material to plaintiffs' cause of action, and that he had been excused from attendance on the court by the defendants' attorney, and that the plaintiffs' attorney did not know that he had been excused until the time for him to testify, and at that time they could not get him. Plaintiffs did not make a motion for continuance on account of the absence of this witness, and we overrule the assignment directed to the action of the trial court in overruling the motion for new trial based upon Dr. Day's testimony.

All assignments are overruled, and the judgment is affirmed.